**Jetty Lee HARVEY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 87–274.

Supreme Court of Wyoming.

May 5, 1989.

Rehearing Denied June 13, 1989.

Steven E. Weerts, Sr. Asst. Public Defender, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, and Hugh Kenny, Asst. Attys. Gen., for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

MACY, Justice.

Appellant Jetty Lee Harvey appeals from his convictions of kidnapping and first-degree sexual assault.[1] Although appellant presents several issues for our consideration, the fundamental and dispositive issue in this case, as in the companion case of *Phillips v. State*, 774 P.2d 118 (Wyo.1989), is whether, under the circumstances of the case, a delay of over one and one-half years between the filing of the criminal complaint and the subsequent trial violated appellant's constitutionally guaranteed right to a speedy trial.

We reverse.

In *Stuebgen v. State*, 548 P.2d 870 (Wyo. 1976), this Court reversed two felony drug convictions and dismissed the informations where there had been a delay, largely attributable to the State and the trial court, of eighteen months between the defendants' arrests and their trial. Three years later, in *Cherniwchan v. State*, 594 P.2d 464, 470 (Wyo.1979), although we declined to dismiss the defendants' felony convictions on speedy trial grounds, we issued a stern warning admonishing

law enforcement officials throughout Wyoming that this must not happen again, and all persons—whether they be prisoners or whomsoever—will be given their Rule–5 and speedy-trial rights, fail-

---

1. Appellant was charged alternatively on both crimes as either a principal or an aider and abettor. Wyo.Stat. § 6–1–201(b) (1977) provides that an accessory before the fact, i.e., an aider and abettor, may be charged, tried, convicted, and punished as if he were a principal. Although the jury was instructed as to aiding and abetting, the verdict form provided to the jury did not distinguish aiding and abetting from the principal crime, and the verdict indicates appellant was convicted as a principal on both crimes. The judgment and sentence, however, indicates appellant was convicted alternatively as either a principal or an aider and abettor as to each crime. This discrepancy is not raised as an issue, however, and it is immaterial to our disposition in this case.

ing which the supervisory authority of this court will be brought into play to address such negligent conduct.

Even though we have reviewed a number of cases since *Cherniwchan* in which a speedy trial violation has been alleged, we have not, in these cases, encountered a clear violation necessitating reversal and dismissal. It was perhaps inevitable, however, that this Court would eventually be confronted with a case wherein the result in *Stuebgen* and the warning in *Cherniwchan* would not have been heeded. This is that case.

The crimes involved in this case are serious. Appellant, Everett Phillips (whose appeal comprises the companion case of *Phillips*, 774 P.2d 118), and David Swazo were arrested in January 1986 in connection with the January 5, 1986, abduction and rape of a Rock Springs woman. Although at trial the prosecution and the defendants presented conflicting versions of the significant events, the jury was entitled to and did accept the evidence presented by the State, which is summarized briefly as follows.

The State's evidence indicated that appellant, Phillips, and Swazo abducted the victim from a Rock Springs street on the evening of January 5, 1986, forced her into Phillips' crew cab pickup, and drove away. Thereafter, as the vehicle proceeded to drive to the outskirts of the city, Swazo sexually assaulted the victim in the back seat, with encouragement from appellant and Phillips. Phillips drove the pickup to an isolated trailer court and parked, indicating that he intended to join in and continue the assault. Unbeknownst to the men, however, the abduction had been witnessed by an individual in a nearby vehicle. This witness followed the pickup to the trailer court entrance and then contacted law enforcement authorities. The police responded quickly and intercepted Phillips' pickup as it was leaving the vicinity, the men having seen the police. The police rescued the victim and arrested appellant and Swazo on the spot. Phillips was arrested later upon further investigation. The State's evidence indicated that the police intervention very likely saved the victim from further violence, at least in the form of further sexual assault.

On January 9, 1986, a criminal complaint was filed in Sweetwater County Court, charging appellant with kidnapping and sexual assault in the first degree or aiding and abetting in those crimes. Appellant was appointed counsel, and a preliminary hearing was held on January 29, 1986, at which appellant was bound over to the district court.

On February 5, 1986, an information was filed in district court charging appellant identically with the county court complaint. An arraignment was also held on February 5, at which time appellant entered a plea of not guilty, and his bond was continued. At this arraignment, the district court advised appellant that, if he pleaded not guilty, he was entitled to a jury trial within 120 days. On February 18, 1986, appellant filed a motion for discovery and a motion to dismiss. The record does not indicate whether the district court ever ruled on these motions.

At this point the record becomes totally silent as to any further proceedings for a period of nearly ten months. The next entry in the record occurs on December 5, 1986, when a letter from the court to counsel was filed notifying the parties that the court had consolidated appellant's case with that of his co-defendants, Phillips and Swazo, and that trial was set for January 6, 1987. On December 9, 1986, the State obtained a continuance of the trial. This fact is not reflected in the record on appeal, as there is no record of any motion for a continuance, of any order granting the continuance, or of any indication that appellant had any prior notice and opportunity to object to this continuance. The fact that the State obtained this continuance, however, is acknowledged by the State in its brief, and we therefore accept it as a conceded point. Absent the State's concession on this matter, we would be without any explanation of why trial was not held on January 6, 1987, as scheduled.

The record next reflects that on December 15, 1986, appellant's retained private

counsel made an entry of appearance. Correspondingly, on January 22, 1987, appellant's appointed counsel submitted a motion to withdraw as counsel, which was granted by the court on that same date.

In January 1987, another lapse in the record occurs. On January 16, 1987, appellant's retained counsel submitted to the district court a motion to dismiss for lack of a speedy trial. This motion was not filed, for reasons that remain unknown, but again the State has conceded in brief and in oral argument that the motion was submitted on that date. On April 27, 1987, counsel for appellant filed what was designated as a duplicate motion to dismiss, again on the basis of a speedy trial violation, with an accompanying certificate stating that the January 16 motion had been submitted. Standing alone, we would not accept this representation of counsel as to the earlier speedy trial motion absent record support, but in consideration of the State's concession that it in fact was made, we will credit appellant with having made the earlier assertion of his right.[2]

On February 4, 1987, the district court ordered a presentence investigation, indicating in the order that the investigation had been requested by both parties. The next event of record was appellant's July 2, 1987, motion to disqualify the district judge. This motion was promptly denied. On July 13, 1987, the district court ordered, pursuant to the application of appellant, that a subpoena be issued for Swazo to appear and testify at trial. Swazo, upon a guilty plea, had previously been sentenced to the Wyoming State Penitentiary. On July 20, 1987, appellant adopted and joined in the "BRIEF OF DEFENDANT IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SPEEDY TRIAL" filed by his co-defendant, Phillips.

Appellant's trial began on July 21, 1987. In a pretrial chambers conference, the district court denied appellant's speedy trial motion. The jury, after a three-day trial, found appellant guilty on both charges. Appellant was sentenced to not less than twenty years nor more than thirty years in the Wyoming State Penitentiary on each count, the sentences to run concurrently. This appeal followed.

The right to a speedy trial is found in both the United States[3] and the Wyoming[4] Constitutions. In Wyoming, additional speedy trial protections are provided by W.R.Cr.P. 45(b)[5] and Rule 204 of the Uniform Rules for the District Courts of the State of Wyoming. The specific time constraints of Rule 204, and the exceptions thereto, will be discussed *infra* in connection with the length of delay analysis.

The United States Supreme Court, in *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), held that the Sixth Amendment right to a speedy trial applies to the states through the Fourteenth Amendment. In *Cherniwchan*, 594 P.2d at 467, we quoted the following passage from *Klopfer*, 386 U.S. at 223, 87 S.Ct. at 993:

"We hold here that the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment. That right has its roots at the very foundation of our English law heritage. Its first articulation in modern jurisprudence appears to have been made in Magna Carta (1215), wherein it was written, 'We will sell to no man, we will not deny or defer to any man either justice or right'; ..."

The Supreme Court, in *Klopfer*, traced the evolution of the right to a speedy trial from its origin in the Magna Carta through Sir

2. Although acknowledging the January 16 speedy trial motion, at oral argument counsel for appellee characterized both that motion and the April motion as being "pro forma."

3. The Sixth Amendment to the United States Constitution provides in pertinent part:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *.

4. Similarly, article 1, section 10 of the Wyoming Constitution states:

In all criminal prosecutions the accused shall have the right * * * to a speedy trial * * *.

5. W.R.Cr.P. 45(b) provides in relevant part that, "if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."

Edward Coke's *The Second Part of the Institutes of the Laws of England* to George Mason's bill of rights for the colony of Virginia and thereafter to its prominent position in the Sixth Amendment to the United States Constitution. 386 U.S. at 223–26, 87 S.Ct. at 993–95. *See also United States v. Provoo*, 17 F.R.D. 183 (D.Md.), *aff'd* 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955) (influence of speedy trial aspects of British Habeas Corpus Act upon the Bill of Rights); and Poulos and Coleman, *Speedy Trial, Slow Implementation: The ABA Standards in Search of a Statehouse*, 28 Hastings L.J. 357 (1976) (tracing the right from Magna Carta to the Sixth Amendment). Thus, the Supreme Court, in *Klopfer*, 386 U.S. at 226, 87 S.Ct. at 995, concluded that the right to a speedy trial "is one of the most basic rights preserved by our Constitution."

In *Dickey v. Florida*, 398 U.S. 30, 37–38, 90 S.Ct. 1564, 1568–1569, 26 L.Ed.2d 26 (1970), Chief Justice Burger, speaking for the Court, said:

> The right to a speedy trial is not a theoretical or abstract right but one rooted in hard reality in the need to have charges promptly exposed. If the case for the prosecution calls on the accused to meet charges rather than rest on the infirmities of the prosecution's case, as is the defendant's right, the time to meet them is when the case is fresh. Stale claims have never been favored by the law, and far less so in criminal cases. Although a great many accused persons seek to put off the confrontation as long as possible, the right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial.

(Footnote omitted.)

In *Cosco v. State*, 503 P.2d 1403 (Wyo. 1972), *cert. denied* 411 U.S. 971, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973), this Court adopted the balancing test for evaluating speedy trial challenges enunciated by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). We have applied this test in a long line of cases since *Cosco*, including *Sodergren v. State*, 715 P.2d 170

(Wyo.1986); *Grable v. State*, 649 P.2d 663 (Wyo.1982); *Robinson v. State*, 627 P.2d 168 (Wyo.1981); and *Phillips v. State*, 597 P.2d 456 (Wyo.1979). The balancing test requires that we look at: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. *Barker*, 407 U.S. 514, 92 S.Ct. 2182; *Caton v. State*, 709 P.2d 1260, 1264 (Wyo.1985); *Estrada v. State*, 611 P.2d 850, 852 (Wyo.1980). These four factors must be considered together and balanced in relation to all relevant circumstances. *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *Heinrich v. State*, 638 P.2d 641 (Wyo.1981).

## LENGTH OF DELAY

■ There is not a precise length of delay that automatically constitutes a violation of the right to a speedy trial. *Caton*, 709 P.2d at 1264; *Phillips*, 597 P.2d 456. In *Phillips*, *id.* at 460, however, we noted that,

> when the delay is so protracted as to be presumptively prejudicial, it is a triggering mechanism, which requires "inquiry into the other factors that go into the balance." *Barker v. Wingo*, *supra*, 92 S.Ct. at 2192.

In *Barker*, 407 U.S. at 523, 92 S.Ct. at 2188, the Supreme Court stated that, although the constitution does not require the speedy trial right to be quantified into a specific number of days or months, the states are free to establish a reasonable period in accordance with constitutional standards. *See also United States v. Taylor*, —— U.S. ——, 108 S.Ct. 2413, 2421 n. 12, 101 L.Ed.2d 297 (1988) (*Barker* did not specify a time period, leaving that kind of legislative or rule-making activity to others in a better position to do so).

Some states have set mandatory time limits for bringing a defendant to trial requiring dismissal when the statute or rule has been violated, with exclusions and extensions provided for certain delays, such as those caused by the defendant or necessitated by competency proceedings, et cetera. *See, e.g., State v. Jones*, 111 Wash.2d

239, 759 P.2d 1183 (1988) (applying procedural rule requiring trial within sixty days of arraignment); *Miller v. State,* 706 P.2d 336 (Alaska App.1985) (reversing and dismissing charges upon violation of Alaska R.Crim.P. 45 requiring trial within 120 days of arrest); *People v. Bell,* 669 P.2d 1381 (Colo.1983) (affirming trial court's dismissal of criminal charges where the defendant was not brought to trial within six months of entry of not guilty plea in accordance with § 18–1–405(1) of the Colorado Revised Statutes (1973 and 1978 Repl. Vol. 8)).

Similarly, Congress has enacted the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161–3174 (1982), which decrees that a defendant in the federal courts must be tried within seventy days of the information or indictment, again with exceptions for specified delays, or the charges will be dismissed. Section 3162(a)(2) of the Act provides that, in considering whether the dismissal should be with or without prejudice, the court shall consider the seriousness of the offense, the facts and circumstances of the case that led to the dismissal, and the impact of a reprosecution. The federal courts, however, have recognized that, while review of compliance with the Act is a matter of statutory interpretation, the inquiry into whether a constitutional speedy trial violation has occurred continues to be guided by *Barker.* *United States v. Gonzalez,* 671 F.2d 441 (11th Cir.), *cert. denied* 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982); *United States v. DiFrancesco,* 604 F.2d 769 (2d Cir.1979), *cert. granted* 444 U.S. 1070, 100 S.Ct. 1012, 62 L.Ed.2d 751, *rev'd on other grounds* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980).

■ In Wyoming, Rule 204 (formerly Rule 22) of the Uniform Rules for the District Courts of the State of Wyoming fixes a deadline of 120 days after the filing of the information or indictment for bringing a defendant to trial, with certain delays excluded from the time computation.[6] We have held, however, that Rule 204 is not an exclusive or mandatory test but rather that it is advisory in nature, and it is another factor to be considered in the balancing test from *Barker.* *Caton,* 709 P.2d 1260; *Cook v. State,* 631 P.2d 5 (Wyo.1981); *Robinson,* 627 P.2d 168.

■ Rule 204 provides a convenient and logical starting point for the analysis of the length of delay in the instant case. Under Rule 204(b), the measuring period for speedy trial purposes commences at the date of filing the information or indictment.[7] Here, the information was filed on February 5, 1986. Appellant's trial began on July 21, 1987, 531 days after the information was filed. Rule 204 requires that

---

**6.** Rule 204 provides:

(a) It is the responsibility of court and counsel to insure to each person charged with crime a speedy trial.

(b) A criminal charge shall be brought to trial within 120 days following the filing of information or indictment.

(c) The following periods shall be excluded in computing the time for trial:

(1) All proceedings related to the mental illness or deficiency of the defendant.

(2) Proceedings on another charge.

(3) Delay granted by the court pursuant to Section (d).

(4) The time between the dismissal and the refiling of the same charge.

(5) Delay occasioned by defendant's change of counsel or application therefor.

(d) Continuances may be granted as follows:

(1) On motion of defendant supported by affidavit of defendant and defendant's counsel.

(2) On motion of the prosecuting attorney or the court if:

(i) The defendant expressly consents; or

(ii) The state's evidence is unavailable and the prosecution has exercised due diligence; or

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced.

(e) Upon receiving notice of possible delay the defendant shall show in writing how the delay may prejudice his defense.

(f) If the defendant is unavailable for any proceeding at which his presence is required, the time period shall begin anew upon defendant's being available.

**7.** The date of the information or indictment is not the controlling starting date under a constitutional analysis of speedy trial. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). See discussion in body of opinion, *infra.*

trial be held within 120 days after the filing of the information. Although Rule 204 delineates certain periods that are to be excluded from the count, the record in this case does not reflect any delays properly excludable under the rule. See the discussion regarding the reason for the delay, *infra*. Thus, even though we consider Rule 204 to be advisory only, i.e., a touchstone for analysis, the delay in this case of 531 days, which is in excess of four times greater than the period prescribed by the rule, is more than sufficient to trigger further analysis into the other factors. *See Caton*, 709 P.2d at 1265; and *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192. Additionally, under constitutional analysis, the speedy trial clock starts to run upon arrest or when the complaint is filed. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Caton*, 709 P.2d 1260; *Estrada*, 611 P.2d 850. Appellant was arrested on January 5, 1986, and the complaint was filed on January 9, 1986. Thus, from the date of his arrest, 562 days elapsed before appellant was brought to trial. Although, as we have said, no precise length of delay will automatically constitute a speedy trial violation, the excessive and appalling delay involved in this case is presumptively prejudicial and must be weighed heavily in favor of appellant in the balancing test analysis. *See Caton*, 709 P.2d at 1265; and *Phillips*, 597 P.2d at 460.

## REASON FOR DELAY

The State, in its brief, concedes that there is nothing in the record justifying or even explaining the delay from the initiation of the case until December 1986, a period of approximately eleven months from appellant's arrest and ten months from the filing of the information. We agree. The State argues, however, that the delay encompassing the period from December 10, 1986, to the date of trial is equally attributable to both appellant and the prosecution. This assertion, however, is not borne out in the record, absent resort to speculation.

Unquestionably, delays attributable to a defendant may disentitle him to speedy trial safeguards. *Phillips*, 597 P.2d at 461; *Cherniwchan*, 594 P.2d at 468. Rule 204 embraces this principle in its provisions for excluding certain periods from the 120–day count. Periods excluded from the Rule 204 computation include proceedings regarding the defendant's mental condition, proceedings on other charges, delay resulting from the defendant's change of counsel or application therefor, delay for continuances granted to the defendant, and delay for continuances granted to the prosecution when the defendant expressly consents or the prosecution's evidence is unavailable despite the exercise of due diligence or when required in the due administration of justice. Rule 204(c) and (d).

The State contends that appellant's December 10, 1986, change of counsel (the entry of appearance is dated December 10, but it was not filed until December 15) is a delay factor attributable to appellant. It does not appear on the record, however, that this change caused any delay in the proceedings. Appellant did not request a continuance of the previously set January 6, 1987, trial date. The State argues, though, that appellant did not object to the continuance obtained by the State on December 9, 1986, thereby apparently implying that appellant agreed to the continuance as a fortuitous event giving appellant's new counsel additional time for trial preparation. As mentioned earlier, the record is totally silent as to this continuance, containing neither a motion requesting the continuance nor an order granting the continuance. Were it not for the State's acknowledgment in briefing that it obtained this continuance, our only clue that a continuance occurred, other than appellant's assertion to that effect, would have been the fact that trial was not held on January 6, 1987, as scheduled. No reason for the continuance is apparent. Similarly, on this record, we cannot assume that appellant agreed to a continuance or even that appellant had any prior notice and opportunity to object to it. Thus, this continuance obtained by the State does not qualify for exclusion under Rule 204, and

we attribute the delay caused by this continuance solely to the State. Correspondingly, we cannot connect the delay occasioned by this continuance, inexplicable on the record, to appellant's change of counsel, and we find no delay attributable to that change.

■ The State also attempts to justify the post-December 1986 delay upon assertions that appellant was involved in plea negotiations much of this time, that the State was negotiating a plea agreement with Swazo so that it could obtain his testimony against appellant, and that the docket was crowded. We initially note that there is no record support for any of these purported justifications, except for inferences, and also we observe that the State never sought a continuance upon any of these grounds. With respect to plea negotiations involving appellant, the only record evidence supporting this assertion is the February 4, 1987, order requesting a presentence investigation and a December 26, 1986, letter to counsel from the trial court requesting the parties to confer regarding a plea bargain. This letter is found in the record attached to an affidavit of appellant's counsel, as it was not formally filed in the record by the district court. Although we would probably be safe in assuming that some plea negotiations took place, it would be sheer speculation to attribute, much less justify, any of the delay to plea negotiations without record support. Similarly, with respect to any delay occasioned by the State's plea negotiations with Swazo in return for his testimony, the only record support for such delay is in the fact that Swazo was convicted upon a guilty plea prior to appellant's trial and the fact that he testified for the State against appellant. At what point the plea bargain with Swazo was reached and how much time was spent in reaching that agreement simply cannot be ascertained from the record. The Supreme Court, in *Barker*, 407 U.S. at 534, 92 S.Ct. at 2194, stated that some delay is perhaps permissible for the prosecution to obtain the testimony of a co-defendant. While we agree with that principle, on the record before us we cannot determine how much, if any, of the delay is attributable to the State's attempt to obtain Swazo's testimony. Finally, regarding the crowded docket as a reason for delay, there is no evidence in the record to support that contention.

■ We conclude that none of the cause for the delay can be attributed to appellant. The burden is upon the State to prove that delays in bringing a defendant to trial are reasonable and necessary. *Estrada*, 611 P.2d at 854; *Stuebgen*, 548 P.2d at 875; W.R.Cr.P. 45(b). The State has failed in meeting its burden in this case. While it is recognized that neutral or innocent unnecessary delay should be weighed less heavily against the State than deliberate unnecessary delay, *Caton*, 709 P.2d at 1265; *Estrada*, 611 P.2d 850; *Barker*, 407 U.S. 514, 92 S.Ct. 2182, it is also recognized that such delay must nevertheless be considered, because the government, rather than the defendant, bears the ultimate responsibility for such circumstances. *Estrada*, 611 P.2d at 854; *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192. Here, we are unable to determine whether the delay was in fact neutral as opposed to deliberate, although nothing in the record indicates any sinister motive on behalf of the State. What we do find in this case, however, is simply no reason or justification for the delay, and we cannot say that the State made a good faith effort to bring appellant to trial as quickly as possible. *See Heinrich*, 638 P.2d at 644. Thus, the reason for delay factor weighs substantially in appellant's favor.

## DEFENDANT'S ASSERTION OF HIS RIGHTS

■ Although it is not absolutely necessary that a defendant assert his right to a speedy trial as a prerequisite to an ultimate conclusion that a speedy trial violation has occurred, it is a relevant and proper factor to consider. *Estrada*, 611 P.2d at 854; *Cherniwchan*, 594 P.2d at 469 n. 4; *Barker*, 407 U.S. at 531–32, 92 S.Ct. at

2192–93.[8] In the instant case, appellant moved for dismissal on January 16, 1987, and again on April 27, 1987, and joined in his co-defendant's speedy trial brief before trial. It is noteworthy that appellant's initial assertion of his speedy trial right in January 1987 occurred shortly after he retained private counsel and shortly after the State obtained a continuance postponing the original January 6, 1987, trial date. We have observed a distinction in the instance of an uncounseled failure to assert the right as opposed to a counseled failure to do so. *Estrada,* 611 P.2d at 854–55. *See also Barker,* 407 U.S. at 529, 92 S.Ct. at 2191 (court may "attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client, or from a situation in which no counsel is appointed"). In this respect it is sufficient to note that, once appellant retained private counsel, his speedy trial right was promptly asserted.

The State argues, however, that appellant did not vigorously press the issue despite the two motions. It is true that on the record appellant limited his speedy trial challenges to the two motions and the pretrial brief. It is also axiomatic, however, that a defendant has no duty to bring himself to trial. *Barker,* 407 U.S. at 527, 92 S.Ct. at 2190; *Dickey,* 398 U.S. at 38, 90 S.Ct. at 1569. Under the circumstances of this case, we conclude that appellant adequately asserted his right to a speedy trial and that this factor also weighs in appellant's favor in the balancing test.

### PREJUDICE TO DEFENDANT

The final factor in the *Barker* balancing test is prejudice to the defendant. It is not necessary that prejudice be shown in order to prove a speedy trial violation. *Caton,* 709 P.2d at 1266; *Heinrich,* 638 P.2d at 644. In *Moore,* 414 U.S. at 26, 94 S.Ct. at 189, the Supreme Court said, "*Barker v. Wingo* expressly rejected

the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial." Although prejudice need not be shown, it should be considered as a factor in the balancing test. *Grable,* 649 P.2d at 671. In *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, the Supreme Court observed that prejudice to a defendant may consist of (1) lengthy pretrial incarceration; (2) pretrial anxiety; and (3) impairment of the defense. *See also Heinrich,* 638 P.2d 641; and *Estrada,* 611 P.2d 850.

In both the *Caton* and *Cherniwchan* cases, we cited with approval Justice Brennan's discussion of prejudice to the defendant in *Dickey,* 398 U.S. at 39, 90 S.Ct. at 1569 (Brennan, J., concurring). In *Caton,* 709 P.2d 1260, we adopted Justice Brennan's analysis in *Dickey,* and we held that, in the case of excessive delay, prejudice should be presumed. We stated:

> [T]he kinds of prejudice produced by long delays may be substantial even if the defendant's ability to defend himself is not impaired. The defendant's social relations, freedom of movement, and anxiety over public accusation are seriously affected when the delay is prolonged. These effects are precisely the kinds of prejudice that would be difficult for a defendant to demonstrate if he had the burden of proving prejudice.

709 P.2d at 1266. We further noted in *Caton,* however, that short delays do not ordinarily produce these types of impacts and, if there is prejudice from a short delay, it normally consists of impairment of the defense, which can affirmatively be proven by the defendant. Thus, we held in *Caton* that, "until delay exceeds a point where there is a 'probability of substantial prejudice,' the burden of proving prejudice should remain with the accused." *Id.* at 1266 (quoting from *Dickey,* 398 U.S. at 55, 90 S.Ct. at 1577 (Brennan, J., concurring)). In *Caton,* we determined that a delay of slightly more than six months did not reach the point at which substantial prejudice

---

**8.** In *Barker,* 407 U.S. at 524–28, 92 S.Ct. at 2189–91, the Supreme Court expressly rejected the demand-waiver doctrine, as then applied by some lower federal courts, which provided that a defendant waives any speedy trial consideration for any period prior to a demand for trial.

became probable. In the instant case, however, the delay of approximately eighteen months is sufficiently long to be presumptively prejudicial with respect to pretrial anxiety and related concerns. *Caton*, 709 P.2d at 1266. Although this prejudice to appellant may have been minimal, it cannot be overlooked. In *Moore*, the Supreme Court said:

> [P]rejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay,
>
>> "wholly aside from possible prejudice to a defense on the merits, may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and ... may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty."

414 U.S. at 26–27, 94 S.Ct. at 190 (quoting from *Barker*, 407 U.S. at 537, 92 S.Ct. at 2195 (White, J., concurring)) (citation and footnote omitted).

The other two elements of prejudice identified by the Supreme Court in *Barker*, however, do not appear to be present in this case. Appellant was not subjected to lengthy pretrial incarceration, apparently spending only seven days in jail after his arrest. Further, we do not see, nor does appellant contend, that the delay impaired his trial defense. Of course, the delay enabled the State to obtain Swazo's testimony against appellant, but we do not perceive that this is the type of prejudice properly contemplated in considerations of impairment of defense. Thus, with respect to the factor of prejudice, we conclude that appellant was presumptively prejudiced by the lengthy delay, but only minimally, so that, as to this factor, the balance is tipped only slightly in appellant's favor in the overall balancing test.

## BALANCING THE FACTORS

■ A balancing of the four factors from *Barker* leads us to the inescapable conclusion that a speedy trial violation has occurred in this case. The first three factors—length of delay, reason for delay, and assertion of the right—all weigh substantially in appellant's favor as far as establishing a speedy trial violation. The final factor of prejudice to the defendant is less conclusive, but it again leans slightly in favor of appellant. The case is not even particularly close. The delay in this case of one and one-half years between appellant's arrest and his trial was not only unnecessary, it was inexcusable. In *Cherniwchan*, the concurring opinion made the following comments, which are equally pertinent in the instant case:

> Not only have those responsible for the prosecution of this case violated the rights of these defendants, but they also have failed to perform the responsibilities, which by virtue of their offices, they have assumed. Public officials should not casually or designedly hazard the interest of the people in enforcement of the laws of the State. Those who do should expect to account to their constituencies for such failures for they have not accomplished the obligations of the offices which they hold.

594 P.2d at 470 (Thomas, J., specially concurring).

■ The remedy for a violation of the right to a speedy trial is reversal and dismissal of the information. *Strunk v. United States*, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); *Stuebgen*, 548 P.2d 870. Dismissal is indeed a drastic remedy, but, as the Supreme Court said in *Barker*, "it is the only possible remedy." 407 U.S. at 522, 92 S.Ct. at 2188. The denial of the speedy trial right is different than violations of other constitutionally guaranteed rights of the accused, such as the failure to provide a public trial or an impartial jury or the admission of evidence obtained in an unconstitutional search, because those vio-

lations can generally be corrected by providing another trial in which the defendant's rights are observed. The denial of a speedy trial, however, cannot be remedied by a further trial. It is for this reason that courts are understandably hesitant in finding a failure to provide a speedy trial. *Strunk*, 412 U.S. at 438, 93 S.Ct. at 2263.

In the case at bar, therefore, where the violation is clear, the fundamental determination is reduced to this: Either there is a right to a speedy trial or there is not—and either Rule 204 has some meaning or it is simply an empty gesture of no substance. If the right to a speedy trial has vitality, and we believe that it does, then it must be observed in this case, if ever. The temptation certainly exists in a case such as this, where the crime involved is deplorable, to gloss over the constitutional violation and affirm the conviction, thereby obtaining the popular result. That is a dangerous business. The constitutional guarantee of a speedy trial exists for all of us, and its preservation would be seriously jeopardized if it were to be honored only in those cases where the defendants evoked our sympathy or the crimes were minor in nature. We perceive that the right should apply with equal or greater force when a major crime is involved, because the detriment to the accused of pending unresolved charges and the interests of society in a prompt and decisive response to criminal activity are magnified in cases of serious crime.

It is regrettable, nevertheless, that, in order to preserve this fundamental right, a convicted defendant must slip through virtually unpunished. Guilt or innocence, however, is not the issue. The constitutional guarantee of a speedy trial, as with other constitutional protections for the accused, exists to protect every citizen from oppressive governmental prosecution, and an innocent man facing criminal charges would be little comforted to know that this Court has chosen to overlook constitutional violations in order to uphold the conviction of an obviously guilty man. A constitutional guarantee cannot be selectively observed, with exceptions carved out in the tough cases, without threatening the very existence of the right. Once exceptions are made, the guarantee becomes shallow and meaningless, and its further erosion is inevitable. Former Supreme Court Justice William O. Douglas once commented, regarding the freedoms guaranteed by the Bill of Rights:

> But that guarantee is not self-executing. As nightfall does not come all at once, neither does oppression. In both instances, there is a twilight when everything remains seemingly unchanged. And it is in such twilight that we all must be most aware of change in the air—however slight—lest we become unwitting victims of the darkness.

*The Douglas Letters: Selections from the Private Papers of Justice William O. Douglas* at 162 (M. Urofsky ed. 1987). We will not relegate the speedy trial right to that uncertain twilight.

For the foregoing reasons, we reverse appellant's convictions and remand to the district court with instructions to dismiss the information.

URBIGKIT, J., filed a specially concurring opinion.

THOMAS, J., filed a dissenting opinion in which GOLDEN, J., joined.

GOLDEN, J., filed a dissenting opinion in which THOMAS, J., joined.

URBIGKIT, Justice, specially concurring.

On July 28, 1957, in a meadow beside the Thames, west of London, between Staines and Windsor, the American Bar Association dedicated a memorial to the Magna Carta. The Magna Carta was exacted from King John at the old council ground called Runnymede in June of 1215 by means which would have been called extortionate if done by lesser men for lesser gain. Its fortieth article provided: "To no one will we sell, to no one will we deny or delay right or justice."

More than 560 years after the Magna Carta was written, a virtually uneducated Virginia planter with little legal training sat in his room in Raleigh Tav-

ern and wrote the first draft of what was to become the Virginia Declaration of Rights. The eighth article of George Mason's draft provided: "That in all capital or criminal prosecutions a man hath a right to ... a speedy trial by an impartial jury of his vicinage...."

Thus, in Mason's parlance the Magna Carta's pledge not to delay justice was affirmatively stated as its correlative, the right to a speedy trial.

Poulos and Coleman, *Speedy Trial, Slow Implementation: The ABA Standards in Search of a Statehouse*, 28 Hastings L.J. 357, 357–58 (1976) (footnotes omitted).

The preeminence of the speedy trial right in the basic history of our society was most expressively related by federal court Judge Thomsen in *United States v. Provoo*, 17 F.R.D. 183, 196 (D.Md.), aff'd 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955):

The right to a speedy trial is of long standing and has been jealously guarded over the centuries. Magna Carta states: "To no one will we sell, to no one deny or delay, right or justice." This provision was implemented by special writs of jail delivery, and later by commissions of general jail delivery, under which special judges cleared the jails twice a year. In 1679 Parliament passed the Habeas Corpus Act, 31 Car II, ch. 2, which required that prisoners indicted for treason or felony be tried at the next sessions or released on bail, "unless it appear to the Judges and Justices upon Oath made, that the Witnesses for the King could not be produced the same Term, Sessions, or General Gaol Delivery; (2) and if any Person or Persons committed as aforesaid, upon his Prayer or Petition in open Court the first Week of the Term or first Day of the Sessions * * *, to be brought to his Trial, shall not be indicted and tried the second Term, Sessions * * * or General Gaol-delivery, after his Commitment, or upon his trial shall be acquitted, he shall be discharged from his imprisonment." That Act, which Blackstone called "the Bulwark of the British Constitution", was still cherished by the British people at the time our Constitution was adopted, and by Ameri-

can patriots and lawyers, nurtured on Blackstone. Some thought the right of speedy trial and similar rights were so clearly a part of our "liberty" that no Bill of Rights was necessary. But the American people wanted to be sure, and gave the right of speedy trial first place in the Sixth Amendment * * *. [Footnotes omitted.]

Rights of Americans to a speedy trial were confirmed to be a singular essence of our heritage from this constitutional history. The United States Constitution spells out this right through the Sixth Amendment as does the Wyoming Constitution by inclusion in Wyo. Const. art. 1, § 10.

Many, many years more recent than 1215 at Runnymede, in continued concern about another of our foundational constitutional rights, Judge Learned Hand warned:

If the prosecution of crime is to be conducted with so little regard for that protection which centuries of English law have given to the individual, we are indeed at the dawn of a new era; and much that we have deemed vital to our liberties, is a delusion.

*United States v. Di Re*, 159 F.2d 818, 820 (2d Cir.), cert. granted 331 U.S. 800, 67 S.Ct. 1348, 91 L.Ed. 1824 (1947), judgment aff'd 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948).

If there is a thesis in the hysterical anguish pervading discussion by the separate dissents in this case, it can only be historically contrasted to my recognition of why the United States Congress' dissatisfaction with the Barker rule, *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), lead to the enactment of the Speedy Trial Act of 1974, as with passage of defining state statutes or adoption of court rules by the highest tribunals of individual states. Wyoming was not without similar concern as our state justice delivery system searched for justification and compliance with the constitutional criteria of speedy trial. In recognition that the confines of Barker were not necessarily sufficient without more protection, the Wyoming Judicial Conference answered judicially per-

ceived necessity and responsibility by adopting what is now Rule 204, Uniform Rules for the District Courts of the State of Wyoming.

Practical as well as academic criticism of Barker was, from the date of its publication, immediate and continuing. Amsterdam, *Speedy Criminal Trial: Rights and Remedies*, 27 Stan.L.Rev. 525 (1975); Erickson, *The Right to a Speedy Trial: Standards for Its Implementation*, 10 Hous.L. Rev. 237 (1973); Uviller, *Barker v. Wingo: Speedy Trial Gets a Fast Shuffle*, 72 Colum.L.Rev. 1376 (1972); Note, *Constitutional Law—Standards for the Right to Speedy Trial*, 51 N.C.L.Rev. 310 (1972); Recent Development, *Constitutional Law—Sixth Amendment—Right to a Speedy Trial—A Balancing Test*, 58 Cornell L.Rev. 399 (1973).[1]

Responsive to the obvious deficiencies in the ad hoc application demonstrated by *Barker*, which served primarily to avoid constitutional protection and absolve prosecutorial delay in the conviction process, the United States Congress enacted the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161–3174 (1982 ed. & Supp. IV 1986).[2]

The failure of previous judicial attempts to ameliorate the problem drew congressional attention to the need for a speedy trial act. Many states had already adopted their own versions of such an act. Congress focused particularly on the barriers to winning a dismissal and on the lack of interest in accelerating the trial process on the part of judges, prosecutors, and defense attorneys, many of whom had come to rely on delay in order to deal with heavy caseloads. The rising crime rate in the 1960's, and the concomitant increase in the backlog in the federal courts, heightened the legislature's interest in solving the speedy trial problem. This concern over the failure of previous judicial attempts to cure the increasingly lengthy delays in federal criminal trials culminated in the Speedy Trial Act of 1974.

Note, *Determination of Dismissal Sanctions Under the Speedy Trial Act of 1974*, LVI Fordham L. Rev. 509, 514–15 (1987) (footnotes omitted). Many states[3] either

---

1. It is interesting to compare the comprehensive analysis of Circuit Court Judge John C. Godbold in Godbold, *Speedy Trial—Major Surgery for a National Ill*, 24 Ala.L.Rev. 265 (1972), which was at the printers when the Barker case was determined. In his conclusion, Judge Godbold stated:

> Without attempting to cover all aspects of the impact of the ABA Standards and the Second Circuit Rules upon the problems of speedy trial, it should be noted that they strike directly at some of the more difficult areas. Of great importance is the removal of the focus of responsibility from the defendant to the court and public prosecutor. In this vein, the necessity for demand by the accused is eliminated, except in the procedural sense of moving for discharge before trial or plea of guilty. Also, the ABA Standards provide for and the Second Circuit Rules both provide for and fix, definite time periods. The necessity for the existence and proof of individual prejudice is thus eliminated.

Id. at 293 (footnote omitted).

Obviously, his concerns were not answered by the ad hoc subjective balancing thesis then provided by the Barker decision where the length of delay is actually only considered as a triggering mechanism before consideration of any substantive contemplation of the constitutional interest. Project, *Sixteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1985–1986*, 75 Geo. L.J. 713, 953 (1987).

2. See *United States v. Taylor*, —— U.S. ——, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988); *United States v. Pollock*, 726 F.2d 1456 (9th Cir.1984); Annotation, *Excludable Periods of Delay Under Speedy Trial Act (18 USCS §§ 3161–3174)*, 46 A.L.R.Fed. 358 (1980); and Note, *Speedy Trial Act of 1974—Dismissal Sanction for Noncompliance with the Act: Defining the Range of District Courts' Discretion to Dismiss Cases with Prejudice*, 79 J.Crim.L. & Criminology 997 (1988).

3. Note, supra, LVI Fordham L.Rev. at 514 n. 40 states:

> See, e.g., Cal. Penal Code § 1382 (West 1982) (enacted 1872); Ill.Ann.Stat.Ch. 38, ¶ 103–5 (Smith–Hurd 1980) (enacted 1963); Nev.Rev.Stat. § 178.556 (1987) (enacted 1967); see also Constitutional Right, supra note 21, at 697–98. Congress sometimes referred to the state speedy trial acts during legislative debates. See S.Rep. No. 1021, 93d Cong., 2d Sess. 14–17, 21–22 (1974); 119 Cong. Rec. 3264 (1973) (remarks of Sen. Ervin).

Similarly, see Iowa—Dunahoo and Sullins, *Speedy Justice*, 22 Drake L.Rev. 266, 291 (1973), which states:

> The first and best speedy trial protection afforded a defendant is pursuant to a fixed-time dismissal statute with criteria of dismis-

enacted ameliorative statutes or adopted rules to meet practical obligations and assure workable remedies for speedy trials. The American Bar Association, in recognition of the insufficiency of *Barker,* provided scholastic and moralistic leadership by proposals for judicially adopted rules and legislative enacted statutes to establish defined time limitations. Among the examples of states responding were South Dakota, New Jersey, and North Carolina. *State v. Reekes,* 59 N.C.App. 672, 297 S.E.2d 763, review denied 307 N.C. 472, 298 S.E.2d 693 (1982). Cf. *State v. Pippin,* 72 N.C.App. 387, 324 S.E.2d 900, 908, review denied 313 N.C. 609, 330 S.E.2d 615 (1985). Included in decision was the determination that the protection of the Speedy Trial Acts or court rules created or confirmed new rights that were to be supplementary to the *Barker* enunciated federal constitutional right to a speedy trial and that a showing of prejudice was not always necessary before the rights for constitutional compliance could mature to justify relief. *State v. Williams,* 85 Wash.2d 29, 530 P.2d 225 (1975).

In introduction, it is noted that Wyoming, in early territorial legislation, anticipated what is today the modern trend by about one hundred years.[4] How far we are called by some to regress from that heritage today. Comment, *The Speedy Trial Guarantee: Criteria and Confusion in Interpreting Its Violation,* 22 De Paul L.Rev. 839 (1973); Comment, *Constitutional Right to a Speedy Trial: The Element of Prejudice and the Burden of Proof,* 44 Temp.L.Q. 310 (1971); Note, *Speedy Trials: Recent Developments Concerning a Vital Right,* 4 Fordham Urb.L.J. 351 (1976); Note, *Speedy Trial: A Constitutional Right in Search of Definition,* 61 Geo.L.J. 657 (1973); Note, *Speedy Trial Schemes and Criminal Justice Delay,* 57 Cornell L.Rev. 794 (1972); Note, *The Lagging Right to a Speedy Trial,* 51 Va.L.Rev. 1587 (1965); Note, *The Right to a Speedy Criminal Trial,* 57 Colum.L.Rev. 846 (1957); Recent Development, *Constitutional Law—Criminal Procedure—Right to a Speedy Trial—Where There Has Been a Substantial Delay and Claimant Raises a Prima Facie Showing of Resultant Harm, Burden of Proving Absence of Prejudice Held to be on Commonwealth,* 17 Vill.L. Rev. 365 (1971).[5] See also Annotation, *Continuances at Instance of State Public Defender or Appointed Counsel Over Defendant's Objections as Excuse for Denial of Speedy Trial,* 16 A.L.R.4th 1283 (1982) and Annotation, *Accused's Right to Speedy Trial Under Federal Constitution—Supreme Court Cases,* 21 L.Ed.2d 905 (1969). Cf. *Meshell v. State,* 739 S.W.2d 246 (Tex. Cr.App.1987), where the Texas speedy trial act was declared unconstitutional under the state separation of powers concept. Assurance of a speedy trial remained a prosecutorial and judicial responsibility. *Branscum v. State,* 750 S.W.2d 892 (Tex.App. 1988). See likewise *State v. Kolb,* 755 S.W. 2d 472 (Tenn.Cr.App.1988).

Realistic impairment of defense is a causity of extended delay with which the presumption of prejudice is logically related. *State v. Langone,* 127 N.H. 49, 498 A.2d 731 (1985). But likewise, a singular public interest is involved. *State v. Striker,* 87 Wash.2d 870, 557 P.2d 847, 851 (1976) states:

A speedy trial in criminal cases is not only a personal right protected by the federal and state constitutions (Const. art. 1, § 22), it is also an objective in

---

sal being demand, lapse of the fixed-time, motion to dismiss, and no showing of good cause for delay by the state.

See also South Dakota—*State v. Hoffman,* 409 N.W.2d 373 (S.D.1987); Note, *State v. Hoffman: The 180–Day Rule and a Lack of Balance,* 33 S.D.L.Rev. 165 (1988) and New Jersey—Wice, *The Speedy–Trial Dilemma: A Handbook on Reform,* 23 Crim.L.Bull. 323 (1987).

**4.** See review of the prior Wyoming statute, *State v. Keefe,* 17 Wyo. 227, 98 P. 122 (1908) and

Note, *The Obligation of Securing a Speedy Trial,* 11 Wyo.L.J. 44 (1956).

**5.** The author of Note, supra, 61 Geo.L.J. at 657, by introduction, quotes from U.S. Const. amend. VI and C. Dickens, Oliver Twist 333 (Chas. Scribner & Sons, New York 1901):

"In all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial...."

" 'If the law supposes that,' said Mr. Bumble, 'the law is an ass.' " [Footnotes omitted.]

which the public has an important interest. Some of the considerations which affect the interests of society generally are mentioned in a Note, *Speedy Trials, Recent Developments Concerning a Vital Right*, 4 Ford.Urb.L.J. 351, 353 (1976). The author states:

"A defendant in a criminal case can achieve definite advantages through delay. Once trial starts, stale cases are more easily challenged by defense attorneys on cross examination. Juries are often disenchanted with offenses that have occurred in the remote past. If prosecution witnesses become unavailable over long periods of time or prosecutorial ardor should wane, the guilty benefit at society's expense.

Aside from affecting the probabilities of obtaining a conviction, the speedy trial right has significant impacts upon the quality of judicial action and the possibilities of future criminal conduct. The tendency to postpone trials adds to court congestion and the backlog of cases. To dispose of such backlog, plea bargaining is frequently utilized. In the interest of expediting matters accused persons receive lighter sentences than those they actually may have deserved. A second impact of delay is to weaken the deterrent effect that the criminal justice system should have on would-be criminals.

Finally, the speedy trial right is intricately related to the needs of a well ordered society in several other respects. Guilty persons released on bail for too long tend to commit other crimes or flee the jurisdiction of the courts altogether. Defendants who are not bailed must spend "dead" time in local jails exposed to conditions destructive of human character. For those who are eventually found innocent, their potential to be contributing members of society through any kind of employment is lost during pre-trial incarceration. On the other hand, the possibility of rehabilitating those who are eventually found guilty is diminished since correction procedures cannot be started until after trial. These nonproductive conditions are achieved at a great financial expense to society."

If a scholar from outer space or afar, as unlearned in the warp and woof of the American justice delivery system and constitutional law decisional processes, was asked to critique the meaning and interpretation of the speedy trial litigation, the person would likely opine that it often is a process of saying what clearly is not, must be. The substantive thrust of these hundreds or thousands of cases invokes balancing of constitutional protection against structural bending and explicating constitutional protection. How little is the most we will require in constitutional compliance and how much is the least we will accept in denial becomes the legalistic dilemma for applied constitutional protection in providing speedy trials within our society.

This case and *Phillips v. State*, 774 P.2d 118 (Wyo.1989) pose that rational and moralistic test for this court without regard for the histrionics inculcated in dissents. *Our constitutional oath as Wyoming jurists is not to guaranty the success of every prosecution or assure the approval of every conviction. Quite to the contrary, it is stated for us to support, obey and defend the constitution of the United States and of this state.* Wyo. Const. art. 6, § 20. Among those rights for which we are charged to defend in supervisory responsibility for the operation of the justice delivery system is the guaranty of a speedy trial for those criminally charged. In *Glasgow v. State*, 469 P.2d 682, 686 n. 6 (Alaska 1970), in abandoning a blind adherence only to the federal approach, that court commented:

This interpretation unreasonably restricts the power of the members of this court to fulfill their obligation to uphold the constitution of this state. As such, it must be discarded.

See Comment, *Right to Speedy Trial: Maintaining a Proper Balance Between the Interests of Society and the Rights of the Accused*, 4 UCLA–Alaska L.Rev. 242 (1974).

It is time to reassess the state constitution without diminution from the morass of Barker related pre-speedy trial act federal law. In that direction, the least, as provided by the result-oriented decisions of another tribunal, should not confine the most that we are called to expect from this state's constitution. When the Wyoming system of justice is not constitutionally called to provide what is promised by rules of court and neither the constitution nor rule is accomplished, something is wrong in attitude of constitutional responsibility for this appellate court and for the trial judges.

Perhaps, philosophically, this court should step back and learn something from history. Evisceration of constitutional rights is a quantum of gradual erosion. The guaranty of speedy criminal trials was a very meaningful concern in the foundation of this nation and remained a principal interest when the Wyoming Constitution was written during that hot and uncomfortable summer of 1889. Clearly, the criteria for justice through a speedy trial right was not an aimless admonition to society; it was a defined and specific prerequisite and obligation. Its institutionalization at Runnymede nearly 600 years ago as a standard for justice provides scant authority for the vituperation with which its authenticity is attacked by some members of this court in these cases today.

Fourteen years before statehood, as included in Wyo.Comp.Laws ch. 14 at 158 (1876), the substance of speedy trials was established for the new frontier territory:

SEC. 150. If any person indicted for any offense and committed to prison, shall not be brought to trial before the end of the second term of the court having jurisdiction of the offense, which shall be held after such indictment found, he shall be entitled to be discharged so far as relates to the offense for which he was committed, unless the delay shall happen on the application of the prisoner.

SEC. 151. If any person indicted for any offense, who has given bail for his appearance, shall not be brought to trial before the end of the third term of the court in which the cause is pending, held after such indictment is found, he shall be entitled to be discharged, so far as relates to such offense, unless the delay happens on his application, or be occasioned by the want of time to try such cause at such third term.

SEC. 152. If, when application is made for the discharge of a defendant under either of the last two sections, the court shall be satisfied there is material evidence on the part of the Territory, which cannot then be had, that reasonable exertions have been made to procure the same, and that there is just ground to believe that such evidence can be had at the succeeding term, the cause may be continued and the prisoner remanded or admitted to bail, as the case may require.

For further discussion of this provision, see: Casper, City of, v. Wagner, 74 Wyo. 115, 284 P.2d 409 (1955); State v. Levand, 37 Wyo. 372, 262 P. 24 (1927); State v. Keefe, 17 Wyo. 227, 98 P. 122 (1908); and Note, The Obligation of Securing a Speedy Trial, 11 Wyo.L.J. 44 (1956).

This constitutional protection and system prescription was first applied dispositively in Keefe, 17 Wyo. at 245, 98 P. 122. Chief Justice Potter, writing for the court, recognized that "[t]he Legislature of this state has determined for us, not unreasonably it seems, what, in certain cases at least, is to be regarded as a speedy trial within the meaning of the constitutional requirement.". Id. at 245, 98 P. 122.

That court recognized:

That an accused should be granted a trial without unnecessary or unreasonable delay is not a new idea in criminal jurisprudence. In theory, at least, the right may be said to have been recognized at common law. Under a commission to the judges of general goal delivery they were empowered to try and deliver every prisoner, whereby the jails were generally cleared at least twice in each year. * * * And by the habeas corpus act of 31 Car. II c. 2 (1680), it was provided, among other things, "that every person committed for treason or felony shall, if he requires it at the first week of the next term, or the first day of

the next session of *oyer and terminer*, be indicted in that term or session, or else admitted to bail, unless the King's witnesses cannot be produced at that time; and if acquitted, or if not indicted and tried in the second term, or session, he shall be discharged from his imprisonment for such imputed offense." * * *

The term "speedy trial" as it occurs in the constitution has been judicially interpreted as meaning generally a trial as soon after indictment as the prosecution can with reasonable diligence prepare for, regard being had to the terms of court. * * * A trial "conducted according to fixed rules, regulations and proceedings of law, free from vexatious, capricious and oppressive delays." (6 Ency.L., 2nd Ed., 993.) "A trial regulated and conducted by fixed rules of law, and any delay created by the operation of those rules does not work prejudice to any constitutional right of the defendant." (Church on Hab.Corp., sec. 254; *Sample v. State*, 138 Ala. 259 [36 So. 367 (1903)]).

Id. at 244, 98 P. 122 (emphasis in original). This court further espoused:

[T]he questions here reserved are clearly constitutional, for they involve the constitutional right of an accused in a criminal prosecution to a speedy trial, which right is claimed to have been violated in this case. The statute supplements the constitutional provision and secures or provides a method for securing the right thereby declared. It is to be regarded as enacted for the purpose of rendering the constitutional guaranty effective, and as a legislative declaration of what is and what is not, under the circumstances named, a reasonable and proper delay in bringing an accused to trial in respect of his constitutional right aforesaid. The authorities uniformly hold that such statutes are enacted for the purpose of enforcing the constitutional right, and that they constitute a legislative construction or definition of the constitutional provision—a provision incorporated in most of the state constitutions as well as in the constitution of the United States.

Id. at 243, 98 P. 122.

In 1969, as amended in 1971, this court adopted the present rules of criminal procedure. Included was W.R.Cr.P. 52, which provides:

Rules governing practice in district courts.

The Wyoming Judicial Conference may from time to time make and amend rules governing practice in the district courts not inconsistent with the Wyoming Rules of Criminal Procedure or applicable statutes. Copies of rules and amendments so made shall, upon their promulgation, be furnished to the Supreme Court.

In W.R.Cr.P. 56, "Laws superseded," it was specifically stated that the derivation from territorial days of the speedy trial statutes, then most recently found in Revised Statutes of 1957, §§ 7–234 and 7–235, were "superseded." Surprisingly, W.S. 7–236 (1957), as the third territorial statute, was not included in the supersession section when the criminal rules were adopted. These rules of criminal procedure, in themselves, provided no substitute for the previous statutory limitation. Having at least intended to supersede the historical statutes existent before statehood which provide the substance for constitutional guaranty of speedy trials, no matter what antipathy the constitutional right may have been engendered in rule composition, it cannot rationally be construed that this court intended just to leave the bare constitutional right hanging out without protection or ancillary support. Consequently, in converse attribution, without regard for any inquiry of the appropriateness of constitutional delegation of the primary responsibility of this court for the judicial system and operation of the justice delivery system pursuant to Wyo. Const. art. 5, § 2, the adoption by the Wyoming Judicial Conference of the uniform rules pursuant to the enabling rule of this court, has specific and definable meaning. Consequently, I ascribe to Rule 204 in real substance; not just bland, non-binding philosophic hope. Even if Wyo.Sess.Laws ch. 14 (1876) is

repealed by present rule (which is questioned if no alternative is provided), its actual replacement, Rule 204, cannot be denied substance and meaning until this court provides a further superseding rule within the Wyoming Rules of Criminal Procedure.

Wyoming, except for Rhode Island [6] which adopted and then rescinded a court rule, is the only state which dissected the rule by aberration through a course of decisions after adoption of a state rule or statutes. In denying the desired effect for enforced speedy trials, Wyoming found justification in the excusatory expletives derived from Barker. *Sodergren v. State,* 715 P.2d 170 (Wyo.1986); *Binger v. State,* 712 P.2d 349 (Wyo.1986); *Cook v. State,* 631 P.2d 5 (Wyo.1981); *Robinson v. State,* 627 P.2d 168 (Wyo.1981). The initiative process in the adoption of a Wyoming rule, present Rule 204 can be discerned from the publicized hand wringing of this court in *Cherniwchan v. State,* 594 P.2d 464, 469 (Wyo.1979):

Because of the mercurial characteristics attendant upon the proof of prejudice, and because speedy trial is a fundamental right, Justice Brennan, in *Dickey v. Florida,* supra [398 U.S. 30, 90 S.Ct.

1564, 26 L.Ed.2d 26 (1970)], was forced to conclude:

"... When the Sixth Amendment right to speedy trial is at stake, it may be equally realistic and necessary to assume the prejudice once the accused shows that he was denied a rapid prosecution."

But, how long must prosecution be delayed before courts are warranted in assuming prejudice? There are as many answers as there are courts that have attempted to answer this question.

We speak at length to these issues out of shock and concern, and in the hope that the Bar of this state will know that we recoil in disbelief from a set of facts which reveals that 107 days after arrest have been permitted to pass before the officials responsible have seen fit to bring the accused before a magistrate as required by law—thus delaying their trial accordingly. The question is not whether these defendants have been wronged, but only, are their wrongs prejudicial in a constitutional sense?

Rule 204, formerly numbered Rule 22, was adopted by express rule authority given by this court to the Wyoming Judicial Conference after considerable analysis and effort by the involved district judges.[7]

---

**6.** Topical Survey, *Annual Survey of Rhode Island Law for the 1987–1988 Term,* 22 Suffolk U.L.Rev. 431, 447 (1988). See *State v. Wheaton,* 528 A.2d 1109 (R.I.1987).

**7.** The Wyoming Judicial Conference was initially created by order of the Wyoming Supreme Court to consist of members of the district bench and the justices of the Supreme Court. Under its aegis, twenty-six uniform rules have been adopted. The present status of the conference is undefined by current action of this court. Contrary to any other observed jurisdiction, these rules are not separately approved or adopted by action of the Wyoming Supreme Court and their efficacy is consequently not clarified, except authority for adoption is clearly granted by W.R.Cr.P. 52. Generally, this court has given effect to all uniform rules except the Rule 204 speedy trial rule. This curious treatment may be explained where the court, after analysis of prejudice and the balancing test as previously pursued in *Estrada v. State,* 611 P.2d 850 (Wyo.1980), considered what was Rule 22, which now is Rule 204.

However, our inquiry does not yet end. Before the *Estrada* opinion was handed down on

May 28, 1980, the Wyoming Judicial Conference adopted Rule 22 on September 14, 1979. Rule 22 was not an issue in that case and was not considered by this court in the decision. Authority for promulgation of district court rules is found in Rule 52, W.R.Cr.P., which provides that:

"The Wyoming Judicial Conference may from time to time make and amend rules governing practice in the district courts not inconsistent with the Wyoming Rules of Criminal Procedure or applicable statutes. Copies of rules and amendments so made shall, upon their promulgation, be furnished to the Supreme Court."

There has been no showing in this case that proper procedures for the promulgation of Rule 22 were not followed. This court does not approve or disapprove district court rules upon receipt of a copy as provided by Rule 52, supra. The adoption of Rule 22 by the Judicial Conference was obviously to set guidelines to encourage and motivate prompt disposition of criminal cases and to avoid a constitutional violation with respect to speedy trial requirements. It should be noted particularly that no sanction of dismissal is provid-

This evaluation was even more deathly in constitutional conception and justice system development since it considered Rule 204, as adopted on September 14, 1979, not applicable to *Estrada v. State*, 611 P.2d 850 (Wyo.1980) as published May 28, 1980. Consequently, this court, at that time by intimation is debited with a supersession of what was not even considered.

We presently demean our courts and responsibility to justice if this court does not either abolish Rule 204 so that citizens are no longer able to rely on it, or, conversely, follow it, which is clearly not unachievable. See *People v. Beyah*, 67 Ill.2d 423, 10 Ill. Dec. 568, 367 N.E.2d 1334 (1977); *State v. Brown*, 61 Md.App. 411, 486 A.2d 813, cert. granted 303 Md. 115, 492 A.2d 616, rev'd 307 Md. 651, 516 A.2d 965 (1986); *Vickery v. State*, 535 So.2d 1371 (Miss.1988); *Bailey v. State*, 463 So.2d 1059 (Miss.1985); *State v. Hoffman*, 409 N.W.2d 373 (S.D. 1987); and Rudstein, *Speedy Trial in Illinois: The Statutory Right*, 25 De Paul L. Rev. 317 (1976).

In *Glasgow*, 469 P.2d at 688 n. 9, the Alaska Supreme Court recognized:

> Virtually all of the leading authorities who have studied the matter, however, agree that the right to speedy trial should be fixed in terms of days or months running from a specified event, excluding certain periods of necessary delay or delays at the instance of the defendant, which should also be identified precisely. See Standards Relating to Speedy Trial, § 2.1, Approved Draft, A.B.A. Project on Minimum Standards for Criminal Justice (1968).

See *State v. Cleary*, 3 Conn.App. 349, 488 A.2d 831 (1985), where five continuances were enough and that court did not need to consider constitutional issues. *Furthermore, the integrity of the system demands that the rules are strictly en-*

*forced. Striker*, 557 P.2d 847. See also *State v. Mack*, 89 Wash.2d 788, 576 P.2d 44 (1978). The Minnesota Court of Appeals acknowledged that *Barker* established only a minimum standard as had the Minnesota Supreme Court in establishing a supervisory rule:

> "Nothing we have said should be interpreted as disapproving a presumptive rule adopted by a court in the exercise of its supervisory powers which establishes a fixed time period within which cases must normally be brought."

*State v. Stitzel*, 351 N.W.2d 409, 410 (Minn. App.1984) (quoting from *Barker*, 407 U.S. at 530 n. 29, 92 S.Ct. at 2192 n. 29). Cf. *State v. Bean*, 236 Kan. 389, 691 P.2d 30 (1984).

Peering beyond the flower and fervor of the writings of all justices in this case, the essential message that this author seeks to have this court and our citizens acknowledge as this state's obligation is that timely disposition, as demanded by our constitution, does mean something. I grow weary of rules that are to be applied in society only to others but never to the enforcers. Any application of situational ethics and denigrated constitutional concept is unacceptable. Consequently, I write to concur most strongly with the thoughtful and persuasive majority opinion. Words of anguish and attack for the system's failure of performance cannot absolve a lack of compliance with our own rules, written and required in constitutional responsibility.

A speedy trial means what it says, a speedy trial. The Wyoming district judges, through the Wyoming Judicial Conference, understood what it was. Answering that responsibility, the constitutional interest was to be supported and nurtured through the adoption of the uniform rules. Justice William H. Erickson of the Colorado Su-

---

ed by the rule. To so provide would have caused it to be inconsistent with Rule 45(b), W.R.Cr.P. by defining "unnecessary delay," which this court has decided must be determined on a case-to-case basis following standards and the tests set out in *Estrada*. Its adoption was accordingly admirable but the fixing of an absolute deadline by Rule 22(d), Uniform Rules for the District Courts of the

State of Wyoming was in conflict with, superseded and modified by Estrada.
*Robinson*, 627 P.2d at 171–72 (footnote omitted).

If I were to agree that this was a valid conclusion, which I do not, it would follow that the territorial statute must remain in effect. We cannot amend the constitution by rule recision of a legislative enactment without at least providing an effective and working replacement.

preme Court, as a scholar and activist within the American Bar Association and as a proponent for effectuation of rule rights to speedy trial, recognized a decade and a half ago that:

> The sixth amendment guarantee of a speedy trial has been long recognized as one of the key constitutional provisions in our criminal procedure.

> \*    \*    \*    \*    \*    \*

The United States Supreme Court in *Barker* propounded an ad hoc balancing approach to determine whether a defendant has been denied his sixth amendment right to a speedy trial. This approach creates problems of implementation. If the boundaries of the right are to be developed case by case, a protracted period of problem solving will result. State legislatures should consider solving many of these problems at once by enacting statutory standards. Although the ABA standards will not answer all the questions that will arise, their adoption by statute or court rule is a desirable solution.

Erickson, supra, 10 Hous.L.Rev. at 237–50.

It was in answer to this philosophic responsibility that Rule 204 was developed by the Wyoming judiciary. Unfortunately, once adopted, its parentage and respectability have been regularly challenged by this court without acceptance of a replaceable standard of judicial responsibility. It is easy to see why the legislature invades these perceived vacuums of ignored responsibility by the judiciary for the actual performance of the justice delivery system. *State v. Geraldo,* 13 Ohio App.3d 27, 468 N.E.2d 328 (1983). That rational relationship of territorial statutes, Wyo.Comp. Laws ch. 14 at 158 (1876), to the present court rule cannot logically or ethically be disregarded if the constitutional prerequi-

site to conviction remains to be a speedy trial.

What does this mean to Harvey in his criminal proceedings?[8] On January 9, 1986, a criminal complaint was issued and the warrant executed by arrest. On January 29, 1986, he was bound over to district court following county court preliminary hearing and an information was subsequently filed on February 5, 1986 in the district court, with arraignment accomplished on that same date.

Without benefit of explanation or justification, Harvey's case, as consolidated with the case of Phillips and the principal actor in the offenses, David L. Swasso, was first set for trial on January 6, 1987. Even at the time of this first setting, the Rule 204 time limitation for trial from date of information had expired. The limitation should have expired in early June, or half a year before the case was even first scheduled for trial. A speedy trial motion was filed when the January 1987 trial date did not stand and, by undisclosed assignment, the trial was further delayed to July 21, 1987. Consequently, the time from filing the information to the date of trial exceeded the speedy trial rule by 292 days.

We are called upon to look at this case on its facts in application of our constitutional responsibility. Factually, delay, as definable in this record, cannot be charged to Harvey from prosecutorial request for extension of time. Absolutely nothing is presented in this case in delay justification if the "flag all litigants seek to capture is * * * the reason for delay." *United States v. Loud Hawk,* 474 U.S. 302, 315, 106 S.Ct. 648, 656, 88 L.Ed.2d 640, 654, reh'g denied 475 U.S. 1061, 106 S.Ct. 1289, 89 L.Ed.2d 596 (1986). See also *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed. 2d 183 (1973); *Hayes v. State,* 487 So.2d

---

**8.** Speedy trial was not the only issue presented on appeal. Matters of considerable substance are stated as:

> Whether or not the trial court erred by failure to grant Appellant's Motion in Limine regarding evidence of uncharged wrongs or acts. Whether or not the trial court erred by imposing an illegal sentence and by an abuse of discretion when sentencing Appellant.

> Whether or not the trial court erred by instructing the jury on flight as evidence of guilt when there was no evidence of flight against Appellant.

Additionally, of particular concern to me is the non-responsive challenge to the trial court for prejudice. See footnote 9, infra and *Smallwood v. State,* 771 P.2d 798 (Wyo.1989) (Urbigkit, J., dissenting).

987 (Ala.Cr.App.1986); *State v. Larson*, 369 N.W.2d 323 (Minn.App.1985); *Vickery*, 535 So.2d 1371; *Perry v. State*, 419 So.2d 194 (Miss.1982); *State v. Forsyth*, 761 P.2d 363, 369 (Mont.1988); *State v. Britton*, 213 Mont. 155, 689 P.2d 1256 (1984); *Geraldo*, 468 N.E.2d 328; *State v. Wheaton*, 528 A.2d 1109 (R.I.1987); and *Williams*, 530 P.2d 225. The reason for delay, if given, should be appropriately examined on appeal and each period assigned to the responsibility of the state unless the defendant caused the delay. *People v. Ross*, 145 Mich.App. 483, 378 N.W.2d 517 (1985), appeal denied 1/28/86; *State v. Brooke*, 381 N.W.2d 885 (Minn.App.1986).

Following arraignment on February 5, 1986, Harvey promptly filed an amended motion for discovery and inspection on February 18, 1986 along with a motion to dismiss on the basis that sufficient evidence had not been presented at preliminary hearing through the then departing counsel. The next entry found demonstrating any action in the case was a letter from the trial court dated December 5, 1986, or ten months thereafter, which first set the cases for trial on January 6, 1987 and, secondly, consolidated the three cases. No evidence of a motion by the prosecution for consolidation is of record. Additional counsel entered an appearance for Harvey on December 15, 1986, and prior counsel withdrew on January 22, 1987. Most curiously then, on February 4, 1987, the trial court entered an order for presentence investigation which included a statement that has no other support in record or documentation: "THIS MATTER having come before the Court on the 4th day of February, 1987, and the State and Counsel for the Defendant having both requested a presentence investigation." The speedy trial motion was made April 27, 1987.[9]

The State filed a motion for discovery on July 2, 1987, received an apparent ex parte order for discovery on July 2, 1987, and then first filed some compliance with the nearly year-and-a-half-old discovery request of Harvey by a witness and exhibit list filed July 2, 1987. This is post-indictment delay that does not require the showing of prejudice—it is presumed. *People v. Archerd*, 3 Cal.3d 615, 91 Cal.Rptr. 397, 477 P.2d 421 (1970). For Harvey, justification for the delay is simply non-existent in this record. *People v. Hill*, 37 Cal.3d 491, 209 Cal.Rptr. 323, 691 P.2d 989 (1984); *People v. Vila*, 162 Cal.App.3d 76, 208 Cal. Rptr. 364 (1984). When the delay by passage of time is presumptively prejudicial, *adequate* justification by the state is required. *State v. Haskins*, 220 Mont. 199, 714 P.2d 119 (1986); *Britton*, 689 P.2d 1256.

Simplistically, what is presented is a criminal arrest on January 5, 1986 and a convened trial July 21, 1987, without any explanation in the record for the delay or any events justifying extension or chargeability of time to Harvey's activity. If we are going to disregard the constitutional

**9.** In July 1987, predating the scheduled trial which "however scheduled" occurred on July 21, 1987, Harvey, through retained counsel, filed a motion to disqualify the trial judge on the basis of prejudice as supported by affidavit and an attached letter. This letter was written by the trial court to counsel which, in addition to comments about other cases, stated with relevance to this case:

> I have been requested by the prosecution to set the above cases [including 6. State v. Jeddy Lee Harvey and 8. State v. Everett William Phillips] and on checking each file find that in Item 7 above [David L. Swasso], Swazo [sic] confessed and incriminated both Harvey and Phillips in Items 6 and 8. There were also other witnesses plus the victim. * * *
>
> In view of the strength of all of these cases, I hate wasting time and money trying them and I would appreciate it if you could make

some kind of satisfactory plea bargain. Some might be entitled to probation and others could get prison time. I want the prosecution and the defense to confer in each case, and let me know by January 19 what you want to do.

The letter showed a copy to the prior counsel for Harvey, Patrick S. Werner, who has since been disbarred by this court, but no copy to present counsel who entered an appearance in the case December 15, 1986. Counsel followed the disqualification motion with a letter to the trial court requesting a decision:

> Please advise me of your ruling at your earliest convenience. This is not intended to delay the trial of the matter and, if the Court's ruling is in favor of recusal, I would request the trial not be delayed any further.

His denial is recorded by handwritten notation on a copy of the letter as filed July 6, 1987.

mandate and the clear limitation of the rules adopted for implementation where not only no adequate but no justification at all is afforded, then no delay, whether five years or fifteen years, has any greater call for criticism. A record that is silent will not overcome the presumption against forfeiture by a defendant of a constitutionally guaranteed protection. *Com. v. Moore*, 20 Mass.App. 1, 477 N.E.2d 1033, review denied 395 Mass. 1103, 481 N.E.2d 197 (1985); *People v. Harris*, 61 N.Y.2d 9, 471 N.Y.S. 2d 61, 459 N.E.2d 170 (1983). If the dissents' views are true, we simply write out of our constitution and criminal practice any rights to require a speedy trial in criminal proceedings. This is the "how much is only a little evil" syndrome. This case comes within the well-established principles of thoughtful persuasion that the delay is presumptively improper unless justified. Lacking a semblance of justification, the constitution cannot properly be ignored or the conviction permitted to stand.[10]

In first analysis, we should consider whether the time which exceeds the time limitation established by our court rule creates a violation requirement to demand justification. *DeSpain v. State*, 774 P.2d 77 (Wyo.1989); *Serna v. Superior Court (People)*, 40 Cal.3d 239, 219 Cal.Rptr. 420, 707 P.2d 793 (1985), reh'g denied and opinion modified 12/19/85, cert. denied 475 U.S. 1096, 106 S.Ct. 1493, 89 L.Ed.2d 894 (1986). It is to be answered that first, in essence, we decide if there is a delay. Second, the delay can be presumptively prejudicial. *Serna*, 219 Cal.Rptr. 420, 707 P.2d 793; *State v. Fairchild*, 108 Idaho 225, 697 P.2d 1239 (1985).

In short the standards governing the statutory right to a speedy trial, which we have long observed, still apply, and the defendant is not obliged to show prejudice or affirmatively demand that his rights be observed. This is not to say, of course, that these factors are completely irrelevant. At times they must be considered, particularly where the defendant's constitutional right is asserted. If for instance a short delay is involved * * * or the People can show good cause * * * the defendant might still be entitled to a dismissal if he can demonstrate actual prejudice or a consistent demand for a speedy trial. * * * But when the delay is unreasonably long and the People have not shown good cause, the defendant may rely on his statutory rights without proving more.

*People v. Taranovich*, 37 N.Y.2d 442, 373 N.Y.S.2d 79, 86, 335 N.E.2d 303 (1975). In application of this principle, "[t]he speedy trial provision of the Idaho Constitution is further distinguished by its close nexus to other Idaho laws establishing specific time frames for criminal proceedings." *Fairchild*, 697 P.2d at 1241. The *Fairchild* court held:

The proper appellate response to an infringement of the right to a speedy trial is to set aside the conviction. We do not take such action lightly but believe it to be our duty under the unique circumstances presented here. Accordingly, the judgment of conviction in this case is reversed.

Id. at 1244.

Absent any evidence from which waiver or forfeiture[11] can be adduced, in concur-

---

**10.** A California case, in reversing conviction because of a denial of speedy trial where delay was not explained in either the brief or at oral argument, summarized:

We long ago learned, from our Anglo–Saxon jurisprudential history, that the crown does not win or lose a case, it merely sees that justice is done.

The primary function of the office of prosecutor is to diligently and vigilantly pursue those who are believed to have violated the criminal codes of the state.

In that regard, the guiding light of due process illuminates the field of combat and defines the depth of the duty to be obeyed.

While hard blows may be struck against an opponent, the strike may not be withheld without warrant until such time as occasions an adversarial disability.

The combination of circumstances chronicled here violated fundamental fairness, the touchstone of due process.

*People v. Hartman*, 170 Cal.App.3d 572, 216 Cal. Rptr. 641, 648–49 (1985), review denied 10/28/85.

**11.** There is a difference. See Westen, *Away From Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure*, 75 Mich.L.Rev. 1214 (1977).

rence, I follow the principle enunciated by the California Supreme Court in *People v. Wilson,* 60 Cal.2d 139, 32 Cal.Rptr. 44, 48, 383 P.2d 452, 456 (1963) (quoting from *People v. Godlewski,* 22 Cal.2d 677, 682(3), 140 P.2d 381 (1943)), that statutes (or rules) "are 'supplementary to and a construction of' the Constitution." Consequently, Rule 204, as long as it remains unrepealed, requires a constitutional function in its application. In other words, ad hoc violation of an implementing rule to assure constitutional protection results in a violation of due process, equal protection and Sixth Amendment constitutional guarantees.

Criminal defendants are constitutionally guaranteed the right to a speedy public trial. * * * The sixth amendment guarantee is a fundamental right, made binding on the states by the due process clause of the fourteenth amendment. * * * The Idaho Constitution also affords the party accused in a criminal prosecution the right to a speedy trial. * * * However, the right to a speedy trial under the Idaho Constitution is not identical to the right guaranteed by the United States Constitution. * * * While inquiries into speedy trial claims under the federal constitution involve *ad hoc* determinations under guidelines established by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Idaho constitutional provision has been supplemented by legislation.

*State v. Hobson,* 99 Idaho 200, 579 P.2d 697, 698 (1978) (emphasis in original). See also *State v. Russell,* 108 Idaho 58, 696 P.2d 909 (1985), where delay was factually justified.

To accomplish a desired conviction in contravention of constitutional protections, we cannot ethically engage in an "exercise in strained logic and judicial illusion." *United States v. MacDonald,* 456 U.S. 1, 102 S.Ct. 1497, 1510, 71 L.Ed.2d 696 (1982) (Marshall, J., dissenting). I will not partake in "allowing doctrinaire concepts * * * to submerge the practical demands of the constitutional right to a speedy trial." *Smith v. Hooey,* 393 U.S. 374, 381, 89 S.Ct. 575, 579, 21 L.Ed.2d 607 (1969).

The constitutional mandate that "a defendant is entitled to a speedy trial," *Beavers v. Haubert,* 198 U.S. 77, 86, 25 S.Ct. 573, 575, 49 L.Ed. 950 (1905), only acquires real meaning in application to the justice delivery system. Otherwise, the constitutional provision and perhaps the entire constitution mean nothing if it is to be so casually disregarded.

Suffice it to remember that this constitutional guarantee has universally been thought essential to protect at least three basic demands of criminal justice in the Anglo–American legal system: "[1] to prevent undue and oppressive incarceration prior to trial, [2] to minimize anxiety and concern accompanying public accusation and [3] to limit the possibilities that long delay will impair the ability of an accused to defend himself."

*Hooey,* 393 U.S. at 377–78, 89 S.Ct. at 577 (quoting *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966)) (footnote omitted).

In *Rutherford v. State,* 486 P.2d 946 (Alaska 1971) and *Glasgow,* 469 P.2d 682, the Alaska Supreme Court, addressing both a constitutional mandate and a rule requirement, recognized the morality and the integrity constituents of the court system in operation. Comment, supra, 4 UCLA–Alaska L.Rev. 242. Likewise, we are faced here in basic fundamentals with the morality and integrity of the Wyoming judiciary as charged with the responsibility of enforcing the constitutions of the United States and of this state. Hitler's ascension to the totalitarian control of the Third Reich came not solely from successful elections of the political party, but also from result oriented abandonment of the operational substance of the constitution of the prior short-lived Weimar Republic of Germany. It is to be recognized that the hands of totalitarianism are only separated from any democratic system by a thin veneer provided by the armor of constitutional responsibility and responsiveness.

In admonition and application, this court should in all basic constitutional interests, including attainment of speedy trials, fol-

low the philosophic responsibility enunciated by Chief Justice Warren in *Klopfer v. State of N.C.*, 386 U.S. 213, 223–26, 87 S.Ct. 988, 993–95, 18 L.Ed.2d 1 (1967):

> We hold here that the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment. That right has its roots at the very foundation of our English law heritage. Its first articulation in modern jurisprudence appears to have been made in Magna Carta (1215), wherein it was written, "We will sell to no man, we will not deny or defer to any man either justice or right"; but evidence of recognition of the right to speedy justice in even earlier times is found in the Assize of Clarendon (1166). By the late thirteenth century, justices, armed with commissions of gaol delivery and/or oyer and terminer were visiting the countryside three times a year. These justices, Sir Edward Coke wrote in Part II of his Institutes, "have not suffered the prisoner to be long detained, but at their next coming have given the prisoner full and speedy justice, ... without detaining him long in prison." To Coke, prolonged detention without trial would have been contrary to the law and custom of England; but he also believed that the delay in trial, by itself, would be an improper denial of justice. In his explication of Chapter 29 of the Magna Carta, he wrote that the words "We will sell to no man, we will not deny or defer to any man either justice or right" had the following effect:
>
> > "And therefore, every subject of this realme, for injury done to him *in bonis, terris, vel persona*, by any other subject, be he ecclesiasticall, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay."
>
> Coke's Institutes were read in the American Colonies by virtually every student of the law. Indeed, Thomas Jefferson wrote that at the time he studied law (1762–1767), *"Coke Lyttleton* was the universal elementary book of law students." And to John Rutledge of South Carolina, the Institutes seemed "to be almost the foundation of our law." To Coke, in turn, Magna Carta was one of the fundamental bases of English liberty. Thus, it is not surprising that when George Mason drafted the first of the colonial bills of rights, he set forth a principle of Magna Carta, using phraseology similar to that of Coke's explication: "[I]n all capital or criminal prosecutions," the Virginia Declaration of Rights of 1776 provided, "a man hath a right ... to a speedy trial...." That this right was considered fundamental at this early period in our history is evidenced by its guarantee in the constitutions of several of the States of the new nation, as well as by its prominent position in the Sixth Amendment. Today, each of the 50 States guarantees the right to a speedy trial to its citizens.
>
> The history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution. [Emphasis in original and footnotes omitted.]

My premise in special concurrence is to assure that Wyoming is not now left out somehow in accomplishment of this historical responsibility. *Strunk v. United States*, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); *Dickey v. Florida*, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970).

I decline to strain—unconstitutionally—to affirm.

THOMAS, Justice, dissenting, with whom GOLDEN, J., joins.

Dear Lady:

The Supreme Court of Wyoming has elected to reverse the convictions of two of those who abducted and sexually assaulted you. We are persuaded that they were denied the constitutional right to a speedy trial. Since that right cannot be reinstated at this time, these individuals must go free.

The Court had to be most concerned about the anxiety your tormentors experienced while they were awaiting trial. We assume they must have been distraught because of the uncertainty of what the future might hold for them. The pending charges well may have affected adversely their social relations, inhibited their freedom of movement, and caused them to suffer anxiety because of the public accusation. Possibly, they had some difficulty in obtaining employment, and it is likely there was a cloud of suspicion surrounding them.

It is true that no one threatened to wreak his will on them and then kill them but, on balance, these concerns must be afforded more significance on the scales of justice than the terror and trauma inflicted upon you. These factors have far more societal and legal significance than what these men did to you. The court can do nothing to change your experience, but it can address the right to a speedy trial.

We hope that you can understand and accept the decision of this court. Remember how important the right to a speedy trial will be to you when you commit some crime. Certainly, that right is equally important to all of us when we are involved in criminal misconduct.

Very truly yours,
THE SUPREME COURT OF
THE STATE OF WYOMING

What a tragic letter! Unfortunately, it captures the essence of the opinion of the court. I vehemently dissent.

The majority decision in this case is not necessary. The thesis that the reversal of this conviction and the conviction in the companion case is mandated by constitutional principles is not correct. Justice Golden has ably summarized the law in this area in the companion case of Phillips, and I am pleased to join in his opinion in this case. In terms of constitutional requirements, these facts fit well within established limits.

Since the reversal of these convictions is not required by constitutional precepts, the court's decision simply manifests an exercise of its supervisory authority over the trial courts. I have no fundamental objection to the exercise of such supervisory authority when it is appropriate. Doing so in this case is not a wise choice. For me, the propriety of invoking the supervisory authority would depend upon showing actual prejudice to the accused which interfered with a fair trial.

While I agree that the majority approach is not an accurate application of constitutional requirements, I also have a deep philosophical difference with what the court has done. My analysis of this decision is based upon the premise that the application of constitutional principles is not an end in itself but a means to an end. Invoking constitutional principles as an end in itself is a purely academic approach. Those principles, however, evolved out of a desire to promote the well-being of the citizens of a fledgling nation and to secure for each of them those ideals articulated in the Declaration of Independence:

> " * * * [T]hey are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, * * *."

It is in the light of these claims that I borrow from Handler, *Jurisprudence and Prudential Justice*, 16 Seton Hall L.Rev. 571, 572 (1986), this statement, somewhat out of context:

> " * * * Indeed, as a constituent and vital part of representative democratic government, the judiciary must be highly attuned to the needs and feelings of its citizens; it should be acutely aware of the public's perception of its general performance, as well as its particular decisions. In short, the judiciary cannot be oblivious to the reactions that its own actions have engendered or the effects that its adjudications have created within the society it serves."

My perception of the reaction of the society this court serves to this decision is best captured by parody.

With all due respect to Lewis Carroll, one of the episodes that could be encompassed in his marvelous classic *Alice's Adventures in Wonderland* might well unfold like this:

Alice was following her guide, White Rabbit, through a busy street in Wonderland. White Rabbit pointed to a man and said, "Alice, that man used to be a rapist."

Alice, her interest piqued, replied innocently, "That is interesting. When did he stop being a rapist?"

White Rabbit responded, "Well, you see, he didn't do it."

This puzzled Alice, who asked, "Well, if he didn't do it, how can you say he used to be a rapist?"

White Rabbit answered very patiently, "Alice, you must realize that he didn't do it, not because he didn't do it, but because it took us too long to say he did it."

Alice was amused. She said, "Well, I suppose that does make good sense. I do wonder, however, how we knew it took us too long to say he did it so that it was clear that he didn't do it."

White Rabbit was becoming a bit exasperated, but he explained, "Alice, some of our rule makers went to a private place and voted, and they decided that 531 days is too long to say that he did it. They pointed out that there is a general rule requiring us to say that he did it in 120 days and, therefore, if we don't say he did it in at least sooner than 531 days, then he didn't do it."

"Oh," said Alice, "I suppose that is an appropriate thing for our rule makers to do, but I wonder if there was someone who was a victim when he used to be a rapist."

White Rabbit pondered that question for a moment and then said, "I'm sure there must have been a victim because he could not have been a rapist without a victim."

Alice frowned, but then her face brightened, and she said, "Oh, then, I would understand that, after 531 days, the person who was a victim isn't a victim anymore because the rapist isn't a rapist any more."

White Rabbit applauded. "Alice," he said, "I think you are beginning to appreciate the wonder of Wonderland."

It is appropriate to consider some of the wisdom of Aleksandr Solzhenitsyn in his address entitled *The Spiritual Exhaustion of the West* delivered at commencement exercises at Harvard University. In the course of those remarks, Solzhenitsyn said:

" * * * The defense of individual rights has reached such extremes as to make society as a whole defenseless against certain individuals. It is time, in the West, to defend not so much human rights as human obligations.

"Destructive and irresponsible freedom has been granted boundless space. Society appears to have little defense against the abyss of human decadence, such as, for example, misuse of liberty for moral violence against young people, motion pictures full of pornography, crime and horror. It is considered to be part of freedom and theoretically counterbalanced by the young people's right not to look or not to accept. *Life organized legalistically has thus shown its inability to defend itself against evil.*

"And what shall we say about the dark realm of criminality as such? Legal frames (especially in the United States) are broad enough to encourage not only individual freedom but also certain individual crimes. The culprit can go unpunished or obtain undeserved leniency with the support of thousands of public defenders. When a government starts an earnest fight against terrorism, public opinion immediately accuses it of violating the terrorists' civil rights. There are many such cases.

"Such a tilt of freedom in the direction of evil has come about gradually, but it was evidently born primarily out of a humanistic and benevolent concept according to which there is no evil inherent to human nature; the world belongs to mankind, and all the defects of life are caused by wrong social systems which must be corrected. Strangely enough, though the

best social conditions have been achieved in the West, there still is criminality and there even is considerably more of it than in the pauper and lawless Soviet society. There is a huge number of prisoners in our camps who are termed criminals, but most of them never committed any crime; they merely tried to defend themselves against a lawless state resorting to means outside of a legal framework." (Emphasis added.)

My understanding is that people in this country and people in the State of Wyoming are essentially dissatisfied with the release of criminals based upon what they perceive to be technicalities. I know the immediate response is that this is not a technicality but is a significant constitutional principle.

In applying constitutional principles such as the right to speedy trial, however, it is interesting to note that the true beneficiaries are the lawless individuals. What has occurred in the United States, as Solzhenitsyn so perceptively has noted, is that we have taken principles designed for the benefit of all the people and invoked them only to encourage those who commit crime with the result that they have been forged into shackles inhibiting the lives of most other people.

It is appropriate then to contemplate the constitutional principle in its historical setting. I do not understand that there is much empirical data to support the notion that, in pre-revolutionary times in the United States of America, murderers, rapists, and other common criminals had any particular difficulty in having their cases resolved. Instead, there were people like those alluded to by Solzhenitsyn, political prisoners who were simply trying to defend themselves against the lawlessness of the king. Our forefathers deemed it important to inhibit the incarceration without trial of individuals who were not being brought to trial because there was a serious question as to whether they had committed any crime. The right to a speedy trial demands that such accusations be addressed with dispatch so that political enemies of the government cannot be disenfranchised by the imposition of questionable charges followed by incarceration without trial.

I have no difficulty in supporting the constitutional principle. I even have no difficulty extending it to any criminal case. The difficulty that I have is with invoking the right to a speedy trial when it is not necessary to prevent actual prejudice, but its application, instead, is premised only upon an assumption of prejudice. In this instance, no one is able to suggest that Harvey suffered actual prejudice in defending the case. There is no indication that any evidence which might have been helpful to him has been lost in the process. Harvey was not incarcerated while awaiting trial. Consequently, the only prejudice that can be identified, which might support the invocation of this drastic remedy, is the assumption that he suffered personal anxiety over the public accusation, suffered inhibition of his freedom of movement, incurred an adverse effect on his social relations, had some possible difficulty in obtaining employment, and perhaps lived under a cloud of suspicion. I doubt that a cloud of suspicion is very troublesome to the guilty, and we don't have any question that Harvey is guilty. Harvey didn't even tell us that he was anxious or suffered any other aspect of the assumed prejudice; we simply presume those effects.

The majority opinion appears to faithfully follow the balancing test of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which has been adopted by this court in other cases. It does so only in appearance because, properly applied, the balancing test does not mandate a reversal in this instance. I am not persuaded, however, that the balancing test which has been articulated by the Supreme Court of the United States really addresses the interests which are involved. Scrutiny of *Barker,* and the cases which have followed the balancing test, demonstrates that the concern of the court was a balancing of the interests of the prosecution in trying the case against the interest of the accused in preserving his constitutional right to a speedy trial. Articulated in this fashion, the balancing test assumes an independent interest of the prosecution which

seems to be a superficial assumption. The State has an interest, it is true, but its interest is derived from the common interest of the citizens. On their behalf, the State is charged with protecting them from criminal conduct on the part of others and with enforcing the criminal statutes adopted to that end. The logical consideration is a balancing of this interest of society against the interest of the accused in preserving the constitutional right to a speedy trial, and I perceive that to be a far broader interest than the interest of the prosecution in having an opportunity to effectively try the case.

The interest which must be balanced against the interest of the accused in preserving a constitutional right to a speedy trial is the interest which society has in protecting its collective members from criminal acts. Society has a particular interest, again representing the interest of its collective members, in seeing to the punishment of malefactors in an appropriate fashion. This interest is sacrificed by the majority opinion in this instance simply for the purpose of demonstrating the supervisory authority of this court and, in a sense, articulating a maximum time frame for bringing defendants like these rapists to trial.

I am not unfamiliar with the argument that it is necessary to protect the constitutional rights of an individual such as Harvey in order to secure those constitutional rights for the rest of the people. My response simply is: of what moment are constitutional rights to those innocent victims of gang warfare and hooliganism that have erupted in one of our major cities? More specifically, of what moment are the constitutional rights of this victim of Harvey and his cohorts if she cannot walk the streets of Rock Springs without having this style of outrage inflicted upon her? Why is it necessary to set Harvey free in order to establish a constitutional principle that is well recognized when, in order to do so, prejudice to Harvey can only be perceived by speculation, not by the examination of a physician in a hospital emergency room nor by the perceptions of police officers who interrupted a crime that had the potential to be much more serious than it was? I have come to understand that those constitutional rights did not receive recognition in the context of a society in which crime was rampant. The motive for adopting those statements of rights was to protect citizens from excesses of government, and they were not influenced by the need to protect citizens from individuals who were out of control.

It does indeed seem a fair comment that the individual freedoms articulated in the Bill of Rights have been applied in this country for the benefit only of those who themselves choose to deprive others of life, liberty, or property without any concern for due process of law. This philosophy, instead of protecting citizens, has contributed to the widespread lawlessness that we witness in this country. It is part and parcel of a loss of freedom on the part of those good citizens who now must double lock their doors and who are fearful of going abroad on the streets of our cities and towns, not only in the darkness of night but in the brightness of day. Those of us who serve in the judicial department need to understand that decisions such as this, in many subtle ways, have influenced the level of crime in our society. The criminals among us perceive permissiveness in results like this, and they are encouraged to further depredations.

If these constitutional principles have justification in American society, shouldn't they somehow be interpreted and construed to the end that the interests of society are balanced against individual interests and not simply for the academic purpose of defining the specifics of broad constitutional principles. Indeed, it may be true, as Solzhenitsyn suggests, that Western society has lost its capacity to protect itself from lawlessness. I know that there will be many who will say but, of course, that includes lawlessness on the part of the government. Unfortunately, I am not able to perceive lawlessness on the part of the government in this instance. I can perceive negligence. I can perceive a failure to establish, as a matter of court records, all of the reasons that these trials were

delayed. I can perceive an earnest effort by prosecutors to bring to the bar of justice all three of the perpetrators of this outrage upon this lady. But lawlessness in any way comparable to the conduct of these defendants is simply absent, and there is really nothing to balance in that regard.

In the interest of academic consideration of the constitutional right to a speedy trial, we have structured a bogeyman of governmental lawlessness. We then destroy that bogeyman in the interests, we say, of the citizens. That is not necessary. Perhaps we can deal with one problem at a time. The problem present in this instance was the commission of a vicious crime by Harvey. My judgment and my reason lead me to conclude that society should assure Harvey his just desserts for his criminal conduct. When, and if, governmental lawlessness becomes present, we can address that as the occasion demands. The evil which cries out to be addressed in our time is crime in society.

The judiciary in this country has come to be criticized because it releases those guilty of crime based upon technicalities. When I witness the product of this case, I cannot deny that claim. The majority, for the sole purpose of achieving an academic articulation of the constitutional concept of a right to a speedy trial, has deprived a citizen of Wyoming of the protection that our judicial system should afford her. It has set free two clearly guilty perpetrators of a sexual assault. I perceive that as constitutional imbalance, and the product of this application of constitutional principles designed to protect the freedom of all citizens has been to set free the guilty and leave the victim without recourse.

The next act already is being played in some places around this country. Citizens, having lost confidence in the ability or willingness of the constitutional system to protect them from crime, have begun to pursue vigilante approaches. Given the ingenious capacity of judges to find reasons to set the guilty free, perhaps the citizens should not be severely blamed. On the other hand, the "Oxbow Incident" was not a happy story, and it is far better that the criminal justice system be invoked and pursued than individual or mob response. If that is to happen, however, then the criminal justice system must have an accurate vision of its role, and the attempts to satisfy the innovative and ingenious arguments of academicians perhaps must yield to more pragmatic solutions.

I recognize that dissenting opinions have no force in establishing the rules of law. My philosophical response simply is designed to make it plain that the tender feelings of rapists, murderers, and other common criminals should not be the primary concern of the judiciary. If society is to make any progress in developing a stance which will offer some prospect that law-abiding citizens will enjoy freedom from the fear that has its genesis in the unconscionable criminal conduct of others, then society needs to forge justice. Justice should have priority over the unnecessary effort to elucidate constitutional principles.

I would affirm the conviction.

GOLDEN, Justice, with whom THOMAS, J., joins.

I envision your attention would be captured if the headline on tomorrow's newspaper screamed, "Children Devour Parent." That headline may become a reality because of the majority's decisions in this case and its companion case of *Phillips v. State*, 774 P.2d 118 (Wyo.1989). These two decisions are the delinquent children of the parent case of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). With the majority's help these two children have just devoured their parent. In the same gruesome meal, they have also devoured the doctrine of *stare decisis*. Here is how this cannibalistic parricidium happened.

In the parent case of *Barker* the United States Supreme Court established a four-part balancing test for appellate review of alleged speedy trial violations. In applying that test to Willie Barker's factual situation, the primary facts of consequence of which were nearly five years' delay from criminal complaint to trial and several pro forma assertions of his speedy trial right

and nearly ten months of pretrial incarceration, the nation's highest court found that Willie Barker's speedy trial right had *not* been violated. Barker's conviction of murder and his resulting life sentence were not reversed, and he was not freed.

Mr. Harvey and Mr. Phillips, acting together, committed their kidnapping sexual assault in Wyoming. They were convicted by a jury of their peers after what they essentially admit was a fair trial. They, like Willie Barker, claimed their speedy trial rights were violated. They, *unlike* Willie Barker, are now free.

In applying to Mr. Harvey's and Mr. Phillips' facts of consequence the same balancing test used to analyze Willie Barker's predicament, the majority has achieved what can only be described as an inspired application of the doctrine of *stare decisis.* This latin term means that like cases should be decided alike. Of course, Mr. Harvey's and Mr. Phillips' facts of consequence were not quite the same as Willie Barker's. Willie Barker's trial was delayed nearly five years, Mr. Harvey's and Mr. Phillips' only eighteen months. Willie Barker suffered nearly ten months' pretrial incarceration; Mr. Harvey and Mr. Phillips suffered none. Willie Barker made several *pro forma* pretrial speedy trial assertions, as did Mr. Harvey; Mr. Phillips made none. Mr. Barker's conviction was affirmed and he is now serving his life sentence. Mr. Harvey's and Mr. Phillips' convictions were reversed and they are now roaming the streets of Wyoming as free men. Since Willie Barker's facts of consequence to the balancing test, by any objective measurement, were conspicuously worse than Mr. Harvey's and Mr. Phillips', you would naturally think these cases would be decided alike. But the majority of this court in Mr. Harvey's and Mr. Phillips' cases invokes a judicial presumption, or fiction, to hold otherwise.

Mindful of the differences between the United States Supreme Court's holding in *Barker* and this majority's holdings in *Harvey* and *Phillips,* one can only logically conclude the majority's inspired, yet creative, application of the Willie Barker balancing test dictates an absurd result: were

the majority deciding a Willie Barker-like case today, the majority would reverse Willie Barker's conviction on speedy trial grounds. Thus, the very case which gave birth to the balancing test would be destroyed by that same test. The newspaper headline could then scream, "Twin Brother Devours Parent."

Although not an identical twin to its companion case of *Phillips v. State,* this case is virtually the same as that one. Whatever factual difference exists between the two is, for all practical intents and purposes, legally meaningless. To be precise, the only factual difference is this: Unlike Phillips' lawyer who did not assert his client's speedy trial right until nineteen days before trial, Mr. Harvey's lawyer made two *pro forma* assertions earlier in the litigation. Placing these assertions in proper perspective, the record shows he did not assert the right during the one-year period from the date on which the criminal complaint was filed, January 9, 1986, until January 16, 1987. On the latter date, he filed a motion to dismiss on speedy trial grounds, but chose not to request a hearing on that motion. After sixty days, that motion is deemed denied. Rule 301, Uniform Rules for the District Courts of the State of Wyoming. On February 14, 1987, Mr. Harvey joined with the prosecution in requesting a presentence investigation. On April 24, 1987, he filed a second speedy trial motion to dismiss, but again chose not to request a hearing. After sixty days, that motion is deemed denied. Rule 301, Uniform Rules for the District Courts of the State of Wyoming. Finally, on the day before trial, he joined with Mr. Phillips' brief in support of the latter's *pro forma* motion to dismiss on speedy trial grounds. In my view, based upon my reading of *Barker,* Mr. Harvey's speedy trial assertions are pure *pro forma.* Mr. Harvey and Mr. Phillips are two peas from the same pod.

Perhaps most disturbing is that the analysis and result in this case, and in its companion case *Phillips,* indicate to me that the majority is trying to use these opinions to send a message to the district judge who presided over the trial. They apparently want that district judge and his

colleagues on the district court bench in Wyoming, to know that a slim majority of this court is willing to arbitrarily invoke its supervisory powers to free a pair of men who admit they were fairly convicted of kidnapping and sexual assault, and turn them loose on the people of Wyoming as a kind of "appellate penalty" for the delays in these prosecutions. What the majority is really saying here is that *its* ends justify the extreme and unwarranted means with which it has chosen to castigate the district court. That type of action is not proper under the applicable law of *Barker* in these cases, and is not generally befitting of the highest court of the State of Wyoming.

I fear that the majority has suddenly lost sight of what is really before it in this case and in *Phillips*. There is no question that excessive pretrial delay is undesirable. None of the justices on this court condone excessive pretrial delay in any sense; it was never meant to be a part of our criminal justice system. The abstract merit of excessive pretrial delay, however, is *not* the issue in this appeal nor was it the issue in *Phillips*. Also not at issue in these appeals is the effect of the 120-day limit imposed by Uniform District Court Rule 204. In fact, according to *Barker*,[1] this is probably an issue for the people of Wyoming speaking through their legislature. The only issue before us in these cases is whether we will give substantive analysis to the factors identified in *Barker* in the same way the United States Supreme Court did in that case. I am convinced the majority has failed to do that.

What I said in my dissent in the *Phillips* case applies equally well to Mr. Harvey. By this reference I incorporate the *Phillips* dissent here. If Willie Barker ever reads these majority decisions, he will sure wish he had lived in Wyoming.

I respectfully dissent.

---

1. "We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months. The states, of course, are free to prescribe a reasonable period consistent with constitutional standards, but our approach must be less precise." *Barker,* 407 U.S. at 523, 92 S.Ct. at 2188, 33 L.Ed.2d at 113.